Good morning, Your Honors. May it please the Court, Richard Fischer on behalf of the Proponent, John Perez. I'm going to be talking to you behind the clock and reserving a few minutes. How are you doing? I'm doing great, how are you doing? This is an interesting case in the Court, and I think it gives the Court an opportunity to clarify an area of the law that needs some clarification, which is meaning what kind of showing is required, what kind of cumulative, circumstantial evidence is required to prove pretext. Whether the same actor inferenced is independent. This case is interesting because on its base, it would seem to us very obvious that Mr. Perez has made a clarification case that the Court assumed as much. Again, it's an analysis with the return to shooting. And we have the reasons that were given by the employer. The profit reasons. We believe there's ample evidence to show that they're not worthy of credence. And our study of the qualifying search is very clear that those two things together, permanent issue case and a profit reason speech, show to me unworthy of credence survives in summary judgment. We think that is this case. In a nutshell, we also think that if the Court failed to give the summary judgment evidence in the light most favorable to Perez, as the Court below has required it to do, the merit of the Court to do that means that it would be appropriate for this Court to reverse a grant summary judgment and remand it and at the trier of fact hear the evidence that we have laid out in the concluding papers in our brief. And at the trier of fact make the emphases that we think in honors should have been made by the trial court below. What the trial court did below really was disregarded a very emotional and sort of part of the case, which is the age or trauma of men judging the sexual behavior of women. I mean, that's the elephant in the room in this case. There was allegations of a sexual or romantic relationship between Perez. By the way, the only other thing I can give is that there are two different terms in the case. One is the term of sexual preference, which was defined in the 1983 ruling. In 1983 ruling, Perez had some experience of having sex with women. He came to me and said, when you start having sex with women, you just need to make sure that you conceal the terms of sexual relations between men and women. And I think the only way is to conceal the terms of sexual relations between women and men. And I think they do need to recognize that there is a way for men and women to come to find out who the constitution or the definition of women is. Right. And I was thinking of one of the soldiers that were under the Title VII claim in the act of shooting down a police officer. And I believe it's impossible to separate out the emotional response that the city and the decision-makers had with respect to that incident. Especially when you realize that at the end of the day, what the city did, initially, it was very offended by that behavior. It was offended and labeled it unethical. It was labeled it wrong and worthy of this instrumental affair. It caused a discredit to the department initiative. By the end of the case, at the end of the day, they had totally reversed course on that. It was a complete reversal. And finally, at the end of the day, well, no. That really wasn't so problematic. The theory of our case here, Andres, at least why they made that reversal, was they allowed the male involved in that incident to escape unscathed. And only the woman involved in that incident, as a practical matter, lost her appointment. Well, the woman who was in probation failed to allow her in the department. Yes, Director. You think that that is a fact that, normally speaking, it would have been a normal, simple injunction during a probation case, which, generally speaking, are not problematic. What was problematic here is that Ralph Schnell's effort brought up very faintly. Nine months into the probationary period, those came about precisely when the department, the city, was in the process of reversing course on the extramarital affair case. And so we believe that the distinction between her being a probationer and being a permanent employee is subterfuge. I think it's not. It lacks credence. It lacks credence because it was infused with this campaign to honoring the bell on essential misconduct and to come up with, on the catwalk, additional reasons to justify the attempt to turn off probation. And the three reasons that were given, as the corporal relied upon, we believe, is the arbitrations. They had no credence. If I may briefly run through them. The first was that Det. Richardson says that Jim Perez was, quote, not getting along with female officers. There was no eight or nine month thing to the probationary period before this issue even arises. If Perez was having calls with other female officers, one would think it would have served his card to guess that it brought someone's attention. It didn't happen. Does it matter if the employer actually believed, even though they may have been accurate, but they believe, based on reports, that she had difficulty with other female officers? Now, maybe that's right, maybe it's wrong, but what difference does it make if they legitimately thought that was what the facts were? What makes the difference if you believe that they legitimately thought, and this is our point, that this report took Han's, Smith's, Crawford's reasons as at face value, that he believed them, but we don't believe that's the case. We don't believe the evidence supports that. Rather, Your Honor, we believe the jury could infer, could draw from the type of that complaint and the nature of it to be a dream for the following reasons. One, it was kind of late in the game. Number two, there were only six female officers at the time, out of 116. Okay? There were very, very few female officers at all. In the testimony of Ms. Perez, she did not think she had even worked with female officers. It's a very flawed pool, very unlikely that she would have been even coming in contact with them. She was assigned to many of them. That's what the record establishes. Her performance evaluations, you knew that they would have captured something wrong, and they didn't. Now, their response was, well, we didn't know about it until late in the game, and so that's why we weren't going to propose a response. But nonetheless, as I say, those kinds of problems should have manifested sooner. The second probable reason that we believe is lacking in credence is a citizen complaint, a domestic violence case. A domestic violence victim or complainant calls and says, Perez was rude to me. The non-domestic violence cases are fraught with emotion, very strong feelings, and that is the sum and substance of that complaint. Someone called and complained. No investigation coverage. No confirmation of the nature of the interaction between my client and this domestic violence complainant. Nothing whatsoever was done. No fact-finding. Khan testified himself that he felt there was no need to get my client's input into that incident, or inside of the story, as it were. And so I think the trial, Okay, the jury has never spelled out for an investigation because the person who made the call did not make a formal complaint. I think what happens in those cases, if I understand the record, is the individual can call up and make a complaint, and someone can call them back and inquire, do they want to pursue it further? And the person in this case said no. Well, one might conclude from that, Your Honor, that maybe it was a threatless complaint to begin with. Maybe it wasn't substantial enough to go forward with what happened. We don't know is the problem. But I don't think it's unfair to say that a trial or fact could conclude from that. That's a pretty thin reed to be basing a rejection on probation all by itself, and not a call from someone who doesn't even want to follow through with a complaint. It's weird. So not getting along with female officers, we think, is not credible. Citizenship complaint, not credible. Bad attitude was the third round that the court discussed. Bad attitude regarding the nonexistent shoe-swap practice and policy here. My clients are going through a shoe-swap with imagining which is apparently a standard practice. An officer did it all the time. She's sick, and she's basically being told, you have to make a shoe-swap within 48 hours. She's sick. She says, I can't do that. She begins to make inquiries about, well, of course, the policy, what governs this, if I may. And based on that, Newton is asked to write a memo describing her as having a bad attitude. We tried to contrast that, Your Honors, with similar kind of behavior from Beckett, where he actually yelled at his superior officer concerning the outcome of the term of failure to use the reprimand he got. Beckett goes in there, his superior officer, and basically starts shouting at him. And he did it in some amazing fashion. The memo was condoned. That wasn't the problem. That didn't reflect bad attitude by Beckett. So shot through the record of love are these little cases, one after another, in which the man was treated differently than the female. You have three minutes. Yes, I do, Your Honors. It's 3.09. I'll see if there's a story about it. Good morning, Your Honors. May it please the Court. Stacey Sheston, Vice President Krieger, on behalf of defendant and appellate in the city of Roseville, Chief Daniel Hahn, Captain Stephen Warren, and Lieutenant Cal Paulson. We agree to a point with the characterization of the case by opposing counsel that really what this case turns on, in large part or whole, is the suffering judgment being properly granted because this employee was a probationary outlawed employee with no property interest in maintaining continued employment, and that that employment was initiated and ultimately terminated by the same actor for whom there is no evidence in the record of any gender bias. The question is whether, what was the motivation of the responsible for your incrimination, and was it to change your conduct, sexual conduct, on your part, in your decision to terminate you? In two places in the complaint, I think that's addressed, and the argument must have been fleshed out below because that's the 1983 claim that you referenced earlier. It's not the 1983 claim, it's the 1983 defendant's point where sexual conduct only is protected in this kind of situation. Yes and no. Sexual conduct off-duty is protected, but it's that it has on-duty implications that's the nexus to the complaint. The exact nature of the formal complaint that the department received alleged on-duty inappropriate relational behavior by these two law officers It wasn't alleged as a specific act, if you will, Your Honor. It was more of a they're conducting this relationship while they are on-duty. Well... There were allegations made by the complaining party that they were pursuing and conducting their relational activities, whatever they may be, perhaps including sex. About any relational activities on-duty? Well, I believe, Your Honor, if you refer to the complaint letter itself, it says... Granted, she's a estranged, not-yet-former spouse who was making them, but she was alleging that the behavior was happening on-duty. Ultimately, as it was concluded in the investigation, Your Honor, there was no sexual conduct happening on-duty, but that doesn't mean it's inappropriate to make the inquiry as it relates. Well, the conclusion wasn't that there was nothing improper, but that not that particular behavior was going on on-duty. Ultimately, at the end of the appeal process, once three reprimands were issued to both employees, not just the female, and both of them appealed, the ultimate conclusions were that they'd spent an awful lot of on-duty time calling and texting one another that probably should have been... Well, ultimately, the findings that were made as they were changed subsequent to appealing in the post-second, the ultimate reprimand... Well, there are two different situations. There's the reprimands that both employees were issued, and I think that's part of where I take issue with the argument presented by counsel. ...the justification that in her rights, she was engaged in whatever kind of activity. She was engaged in privately. That doesn't have to be on your basis or in history. And it was not... What was the basis for sending out allegations about how she was manipulating passengers? What did she do on-duty? And if so, how did we find out? Okay. Let me step back. Perhaps no one's understood the original question, and I apologize. The IA looked into, is there or is there not an on-duty relationship that these two parties are conducting, both of them, her and the male officer? That concluded that there was no behavior of that nature happening on duty, and for that, both of them were issued written reprimands. In the termination decision... They were issued written reprimands for a violation of basically the phone policy, the cell phone policy, because they were calling and texting each other an awful lot on duty. For that, they were issued written reprimands. Both of them were. So to the extent... They were offended that perhaps it was happening on duty and that they were working together. If the relationship was inappropriate, some people were married. Both of them had young children at the time. It's what he said. Not that any of that behavior appealed to their feelings. What he said... There's evidence in the record to let Lt. Walsh have his statements, as a matter of fact, at least, said that ultimately resulted in potential written reprimands to both of them, not for that conduct, because they're using an appeals process. And for anyone to suggest that, you know, an ultimate different decision was reached at the end of that appeals process is somehow indicating a nefarious motive is inappropriate, because that's why you have it. I also mentioned Jeremy Moore, who said, if they're considered important that both were married and had smaller children, because it presents a truly ethical dilemma whether or not that is something that could reflect unfavorably on our police department. I think, by the time they were interviewed, they were both subject of what I'll say in the next chapter, that it affected their personalty, because they thought it was unethical for these people to have this relationship, not only but just a general relationship because of their arrogance to both defend their investigation when it comes out of it. And I don't disagree that that happened at an earlier stage in the process that ultimately was changed to simply a violation of the cell phone policy and a resulting written reprimand for both. I don't think that it was not a good thing to make such decisions on a personal basis about morality. And later, as Trump was all over this as well, it was a factor around the cell phones that the chief said the cell phone conduct was negligent and grossly misinduced. I don't think the record reflects that he felt it was of no significance because it was the basis of the ultimate adverse finding against Trump's opposition. Because when the chief said it was of no significance? It was of no significance in his decision to terminate Ms. Perez's employment down the road. That's entirely true, Your Honor. Because both of these officers received written reprimands when that issue was over. The issues that led to the termination decision, which opposing counsel argues are not worthy of credence, were the information that Lt. Richardson provided to Chief Hahn that the plaintiff was not getting along well with other female officers. That there had been this domestic violence complaint of richness that had come in through the electronic system, but for whatever reasons that person didn't want to pursue it, a full IA was not performed. And that she had, as reported by Sergeant Nitton, had an agitated and angry phone conversation with him that he did not invite. Those were the three reasons. I'm calling on Chief's testimony. What he said, he said it was a good decision. So it would be fair for me to say, and even further, that the whole Leah Bangley complaint and the whole of this investigation, all of that didn't have anything to do with the decision to terminate Mr. Perez. No, I would say it was part of this whole investigation that determined that Leah Bangley was one of the red flags, one of the factors that took a new turn to terminate Mr. Perez, right? Yes. It's still happening, and it doesn't go away from his memory that this has been something going on in her probationary period. Your Honor, the reason for the termination? I don't agree that that's true in the sense that it's related to her sexual contact. Is it related to what they were spending on-duty time doing? Sure. Because that's what the ultimate effort's finding was not. What they were doing on duty time was not the same as what they were doing on probation. Your Honor, I would respectfully disagree that that's not what the record reflects. Well, that's what they came up with when they were making their decision after she was discharged. Different? No. Because they both got the same... They both got the same written reprimand. To start with, they both got the same written reprimand after the fact. I'm not talking about what happened to Leah, I'm talking about what happened to her. What factors did they take into consideration? What's your sense of sexual relationship with him? What are the factors that you took into consideration? I would argue that the evidentiary evidence before the trial court in here is no. That applied to both of them. It resulted in a different penalty and different reasons, additional reasons, that surfaced regarding her conduct led to her termination. What are your qualifications as a jury in reference to her time to be decided by the jury? If there's evidence in the record, admissible evidence, of some bias, an illegal motive, from which an inference could be drawn? Well, as a matter of fact, I was told when the chief said that it was a factor that you take into account the fact that those were the reasons given by the captain and the lieutenant in the investigation that led up to the dispute. If you can take those into account, then you have a question of obligation. I disagree in the sense that there is no evidence in the record to demonstrate that either captain or lieutenant Hallstatt were involved in the decision to terminate. They were involved in the underlying investigation that resulted in a written reprimand, that's true. Beyond that, there's teeth on the decision maker, period. There is no evidence in the record to show that anybody else contributed to that other to report events to which he, in good faith, relied on. Well, I think there's a difference in the investigation, your honor, to the conclusions that you were referring to of the other officers who did not participate in his decision. And were the investigations were by these two gentlemen, I suppose, so you think you were morally offended by it? I don't know if you've gotten into the game, but it was an accident that the two of them were married and had young children at the time and they were trying to conduct an investigation. Actually, they were not until they refuted the investigation in which they merged from contract to the investigation. As I said, your honor, it's certainly still in the background of the investigation that was conducted as to both of them, which the chief's motivation is characterized in the chief's decision, which is not about their sexual behavior. Sure. Well, I think you have to show evidence. We can't just pass or say it's a credibility matter. They have to show admissible evidence to show they're either direct. Either way, because he's the same actor who hired her. The investigation of both of them that he quoted again of her. But that was the investigation, your honor. I don't think you eliminated just an investigation of her. The investigation was as to both of them and to on-duty conduct. The investigation included a disproof of their personal conduct. Which had ultimately come down to the only conduct they devised was the self-defense, which the chief said was only the victim that was trying to do it. Respectfully, I think that it goes  But did he know that this was not the product of what you're saying? That that is a perfectly valid argument for saying that was the chief's motivation. The question is, did she just excel or excel at justice in trying to take care of her? She seemed to like hiring her for other reasons. According to what she's motivation was, it's normally a matter for an interagent to travel. To the extent there is some evidence presented of a bias in that motivation, and in a same actor context, it has to be more than just a prima facie level type of bias. Further, with respect to a privacy claim, if that's going to be the asserted illegal motivation, it has to be about the kind of behavior that has a privacy interest that is protected under the Constitution. And what was investigated as to both of them was on-duty behavior as to whether or not that was the conclusion. But that doesn't count. No one's going into it, Your Honor. Finally, I would submit, just in closing, that the especially steep burden that applies to the plaintiff here and to the appellate was simply not met. They're basically timing alone. There's no evidentiary facts to support the type of giant leaps that are being expected, and because of that, we respectfully request that this Court affirm the trial court's decision below in its entirety. Thank you, Your Honor. I have here, Your Honor, a shot as I continue to open it up to comments that the record, I believe, is shot through with pieces of evidence that suggest the motivation here was a proper and focused team of the Department of Community Sexual Transgressions. The woman nevertheless taking action that took the name of Scott Green. There are other pieces in the record. The emotionally sensitive comment about why a woman accompanied my client to the Nevada notice of the IA, that Becky didn't get such a accompaniment because he's male. But the Court has already noticed that all Scott's personal views concerning married life and having young children, that Perez's reprimand involved a reference to her senior married co-worker, and that this type of behavior would not be condoned. All that is in the record. It's really not disputed. Perez, even before she was rejected on probation, has stated overtly that she felt she was being treated differently from male officers. That occurred in the conversation with Newton over the shift swap incident. Captain Moore, in the record, has indicated he wanted to terminate Perez immediately upon hearing of this extramarital affair, even before investigations were done. And Court has had to prevail. They say that through the process of doing an investigation, which concluded what Moore's conclusion was, there was no untoward behavior on duty. And so the instigating matter by the imagining his wife or Mr. Beckley turned out to be full of sound and jury, signifying nothing. It was no fair there when they actually got into it. Nonetheless, the fact of that romantic encounter came often. And at the end of the day, as I said, they reversed course. They whitewashed the previous decision. You know, you're looking at everybody together, but the fact that there was a determination that the decision-maker was a Jew, you know, I don't think you'd want you to overcome this decision. Well, the, uh... You're looking at everything else together. I think just like... Fair enough. You know, I believe the, uh... I believe that the case of Coggins, of course, decision in Coggins is very instructive on that. And I would ask the Court to note that there and said that what's important is the decision-maker's perception. The decision-maker to initially hire, if I may continue with my answer out of time, but I'll just go ahead. The decision-maker's perception on initially hiring Perez as a woman might have been that he didn't have a per se bias against women. But the issue is whether that same decision-maker decided to fire her psychologically or not require it. Psychologically, one was not the same decision-maker. His perception changed. He was triggered by the fact that he viewed her as a sexually promiscuous woman engaging in immoral activity. And that was not presented to him in the initial hiring decision. So I think there's some nuances available in the Ninth Circus Authority with respect to what exactly is a decision-maker's perception for purposes of the same after-inference. And I think, finally, all the points I've mentioned overcome that inference anyway, based on the record, but I'll just end on that. Thank you very much. Thank you.
judges: Reinhardt, Tashima, Molloy